CARMAN F. HAWKINS AND MARY JANE HAWKINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hawkins v. Commissioner
Docket No. 14476-91
United States Tax Court
T.C. Memo 1993-350; 1993 Tax Ct. Memo LEXIS 355; 66 T.C.M. (CCH) 332; August 11, 1993, Filed *355 Decision will be entered for petitioners. P, a veterinary specialist, entered into a service contract with a foreign-country livestock association. The U.S. Agency for International Development (USAID) agreed to fund the contract. Ps claimed the sec. 911, I.R.C., foreign earned income exclusion with respect to P's income earned under the contract. R determined deficiencies on the grounds that P did not qualify for the sec. 911, I.R.C., exclusion. Held: Ps are eligible for the sec. 911, I.R.C., foreign earned income exclusion since P was not an employee of USAID. For petitioners: John DeBruyn. For respondent: Warren P. Simonsen. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated April 3, 1991, respondent determined deficiencies in income tax against petitioners as follows: Year
Deficiency
1985
$ 15,869
1986
21,962
1987
12,692
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. The sole issue for decision is whether petitioners are entitled to exclude as foreign earned income under section 911 income earned in Jamaica and paid to petitioner *356 Carman F. Hawkins by the United States Agency for International Development (USAID) during petitioners' 1985 through 1987 taxable years. Petitioners' entitlement to such exclusion depends on whether, for such years, petitioner Carman F. Hawkins was an employee of USAID. We find that he was not. Thus, we hold that petitioners are entitled to the claimed exclusion. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife, who, for the years in issue made joint returns of income, computed on the basis of a calendar year. At the time the petition in this case was filed, petitioners resided in Larkspur, Colorado. Hereinafter, when used in the singular, the term "petitioner" refers to petitioner Carman F. Hawkins. During the years in issue, petitioners, who were U.S. citizens, lived in Jamaica. 1. History of Petitioner's Work in Jamaica
Petitioner is a doctor of Veterinary Medicine who has conducted a practice in reproduction and artificial insemination of beef and dairy cattle. He worked in Jamaica as the veterinary *357 medical specialist in charge of the country's bovine fertility project (the project) from the project's inception in 1977 though August 31, 1987. Initially, petitioner worked for the Veterinary Division of the Ministry of Agriculture of the Government of Jamaica (the Veterinary Division), from 1977 through August 31, 1984. During those years, petitioner had his office in the Veterinary Division, which also supplied him with secretarial support. Petitioner traveled to farms in the 13 parishes of Jamaica, where he performed veterinary services. He supplied his own vehicle and traveled approximately 25,000 miles per year on behalf of the project. When petitioner's services were desired, the veterinary officer in each parish would relay requests from farmers to the secretary in the Veterinary Division. Petitioner would then schedule his appointments directly with the farmer or through the farmer's local veterinary officer. Petitioner promoted the project by speaking at livestock field days and by writing articles for the local newspaper. He reported his activities to the Veterinary Division on a constant basis and routinely consulted with the Deputy Director of the Veterinary *358 Division regarding those activities. Petitioner's work was sponsored by the Canadian International Development Agency (CIDA) for the first 4-1/2 years of the project. CIDA supplied funds for petitioner's salary, travel, veterinary supplies, and housing. When the funding from CIDA was about to run out, the farmers lobbied the Ministry of Agriculture (Ministry) to continue the project. The Ministry then obtained funding for petitioner's salary for 2 additional years from the United Nations (UN). Petitioner's work with the project continued on the same basis for the 2 years under UN funding, except that the Ministry provided petitioner's housing and travel and the Ministry billed the farmers for petitioner's services. Petitioner reported fees for his services on a monthly basis to the Veterinary Division. The Veterinary Division then would bill and collect those fees. The money collected was paid into the general fund of the Ministry. Petitioner, while at the Veterinary Division, worked with the Jamaica Livestock Association (JLA), a cooperative association to which practically all of the farmers he worked with belonged. When the funding from the UN was scheduled to terminate, *359 the farmers again lobbied the Ministry to continue the project and worked through JLA and its managing director to achieve that end. Ultimately, the Ministry obtained a grant from USAID to cover the costs of petitioner's further participation in the project. Petitioner did not participate in the Ministry's negotiations with USAID. 2. USAID
USAID, under the authority of the Foreign Assistance Act of 1961, Pub. L. 87-195, 75 Stat. 424, is the U.S. Government agency that carries out economic assistance programs in friendly developing countries. USAID classifies those who, directly or indirectly, receive USAID funds to carry out USAID's missions into one of four classifications: Direct hire employees; personal service contractors; direct USAID contractors; and contractors under a country contract, sometimes called a host-country contract. Direct hire employees are appointed to a position under the civil service and foreign services laws of the United States for an indefinite term. Personal service contractors are individuals hired under specific authority granted to USAID to hire individuals overseas. Both direct hire employees and personal service contractors are treated *360 as employees by USAID. Direct USAID contractors are parties with whom USAID has a direct contractual or grant relationship. USAID does not consider itself to have a contractual relationship with any employee of a direct USAID contractor. Host-country contracts are contracts entered into between a host-country government (or a host-government-designated institution) and an individual or other contracting party. Host-country contracts are entered into to fulfill the terms of a grant or loan by USAID to the host-country government. USAID does not consider itself to be in contract with any party receiving a host-country contract or any employee of such party. USAID may retain grant or loan funds allocable to a host-country contract and disburse such funds to meet the commitments and obligations incurred by the host country in entering into the host-country contract. 3. Petitioner's Contracts With JLA
Petitioner entered into a contract with JLA in August 1984 (the 1984 contract) and a further contract in September 1986 (the 1986 contract; collectively, the two contracts will be referred to as the contracts). The 1984 contract was for the period of September 1, 1984, through *361 August 31, 1986, while the 1986 contract ran from September 1, 1986, through August 31, 1987. The contracts incorporated the provisions routinely required in host-country contracts by USAID, supplied a generalized description of petitioner's duties under the contract (which continued the work he had been doing beforehand), and elaborated the benefits to be accorded petitioner. The contracts reserved certain rights to USAID and attempted to clarify the relationships amongst the parties. The parties hereto understand that the contract has reserved to AID certain rights such as, but not limited to, the right to approve the terms of this contract, the Contractor, and any or all plans, reports, specifications, subcontracts, bid documents, drawings, or other documents related to this contract and the project of which it is part. The parties hereto further understand and agree that AID, in reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by AID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing *362 this project and shall not be construed as making AID a party to the contract.
Pursuant to the contracts, petitioner received compensation in U.S. currency as follows: Year
Amount
1985
$ 49,000
1986
63,641
1987
46,735
In order to receive salary and reimbursements under the contracts, petitioner was required to submit a voucher to the USAID office in Kingston, Jamaica. USAID retained the grant funds that had been awarded to fund petitioner's contracts with JLA and made disbursements directly to petitioner. USAID did not withhold Federal income tax or Social Security tax from the disbursements to petitioner. The contracts also provided for petitioners to be reimbursed by USAID for the cost of their housing in Jamaica and for the cost of petitioner's workmen's compensation insurance. For the first 2 years, petitioner's travel allowance was paid by USAID. For the last year, his travel allowance was paid directly by JLA. USAID granted petitioner commissary and diplomatic pouch privileges, which he used, and medical unit privileges, which he did not use. Those privileges were not requested by petitioner but were negotiated by JLA with USAID to be part of JLA's contracts *363 with petitioner. The contracts provided that petitioner would be under the technical direction of JLA's managing director. Pursuant to the contracts, USAID was to make payment to petitioner only after the performance of his duties was certified by the managing director. The contracts also stated that "the Contractor will at all times maintain his status as an independent Contractor, and for no purpose will be considered an employee of the Organization [JLA]." Only JLA, and not USAID, was granted the right to terminate petitioner's employment in the event that he defaulted on his obligations under the contract. Both the 1984 contract and the 1986 contract were signed by petitioner and JLA's managing director. USAID is a signatory to neither contract. 4. Day-to-Day Relationship of the Contracting Parties
Once funding for the project was provided by USAID, and petitioner had entered into his contracts with JLA, petitioner's office was relocated to JLA. His duties were the same with JLA as they had been with the Veterinary Division. In addition to providing petitioner with an office, JLA also furnished the services of a secretary. Farmers contacted petitioner through his *364 secretary at JLA. Petitioner would check in at the JLA office each day to see what requests had been made for his services. Each month he submitted a report to JLA detailing his activities and the fees to be collected from the farmers. JLA collected and kept those fees. Petitioner reported to the Managing Director and discussed various issues with him at least twice a week. In the absence of the Managing Director, petitioner would communicate with another veterinary officer who was an employee of JLA. Pursuant to the terms of the contracts, JLA submitted a monthly statement or memorandum to USAID to certify that petitioner's work was satisfactory. As stated, petitioner was paid directly by USAID, upon the submission of a voucher to its office in Kingston. Petitioner's voucher was reviewed, approved and signed by an administrative officer who was responsible for the oversight of the USAID project. Occasionally, three or four times a year, petitioner and the administrative officer would engage in longer conversations about local events not necessarily connected with agriculture. Petitioner was not otherwise involved with USAID's office or personnel in Jamaica concerning his *365 work. Ultimate Finding of Fact
Petitioner was not an employee of USAID during the years in issue. OPINION Section 911 provides, in relevant part: (a) Exclusion from Gross Income. -- At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year --
(1) the foreign earned income of such individual, and (2) the housing cost amount of such individual. (b) Foreign Earned Income. -- (1) Definition. For purposes of this section -- (A) In general. -- The term "foreign earned income" with respect to any individual means the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable. (B) Certain amounts not included in foreign earned income. -- The foreign earned income for an individual shall not include amounts -- * * * (ii) paid by the United States or an agency thereof to an employee *366 of the United States or an agency thereof * * *
The parties do not dispute the facts that petitioner was a "qualified individual", the USAID is an "agency" of the United States, and the income in question was earned abroad. The dispute is solely whether, during the years in question, petitioner was an employee of USAID. If he was, then, clearly, petitioners are not entitled to the exclusion provided for in section 911. See sec. 911(b)(1)(B)(ii). In the absence of an applicable definition of the term "employee" in the Code, we must look to common law concepts. Matthews v. Commissioner, 92 T.C. 351, 360 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990); cf. Nationwide Mutual Ins. Co. v. Darden, 502 U.S.    ,    , 112 S. Ct. 1344, 1348 (1992). Petitioner was an employee of USAID if there existed between them the conventional master-servant relationship as understood by common law agency doctrine. See Nationwide Mutual Ins. Co. v. Darden, 502 U.S. at    , 112 S. Ct. at 1348. The determination is one of fact. Matthews v. Commissioner, supra at 360 *367 (specifically dealing with section 911); Detorres v. Commissioner, T.C. Memo. 1993-161 (same). While tax cases that deal with the question of employee status usually involve a determination of whether a person is an employee or an independent contractor, the principles are equally applicable to determine by whom (if anybody) an individual is employed. Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). As we have said: In determining the existence of a common law employer-employee relationship, "the crucial test lies in the right of control, or lack of it, which the employer may exercise respecting the manner in which the service is to be performed and the means to be employed in its accomplishment, as well as the result to be obtained." * * * [Matthews v. Commissioner, supra at 361; citations omitted.]
Cf. Nationwide Mutual Ins. Co. v. Darden, 502 U.S. at    , 112 S. Ct. at 1348. Control, however, is not the only factor to be considered. Other factors are important. Id. *368 at    , 112 S. Ct. at 1349 (setting forth certain other factors and stating: "Since the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, * * * all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" (quoting NLRB v. United Ins. Co., 390 U.S. 254, 258 (1968))). Nevertheless, the right-to-control test is the master test of an employment relationship. Matthews v. Commissioner, supra at 361; Detorres v. Commissioner, supra.As Judge Learned Hand stated in Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943) (with regard to control): "The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said". The income in question was paid to petitioner in consideration of the services he performed pursuant to the contracts he entered into with JLA. The contracts did not, as between USAID and petitioner, establish the relationship of *369 master and servant. As a preliminary matter, although it is clear that USAID dictated a substantial portion of the terms of those contracts, and stood as angel behind them, USAID was not even a signatory thereto. The services required of petitioner are set forth with some particularity in an appendix to the contracts. All such services are to be rendered to or for the benefit of JLA. The contracts speak in terms of petitioner's obligations to "assist" and "advise" JLA. Clearly, an interactive relationship is contemplated. JLA is obligated to provide logistical support (secretarial support, supplies and equipment, certain housing, and transportation support) to petitioner. JLA is the only entity mentioned in the contracts that is entitled to give technical direction to petitioner. The managing director of JLA is identified as both the individual to whom petitioner is to report and the contracting agency official in charge of the contract. USAID's role under the contract is limited primarily to making payment to petitioner upon certification of performance of services by the managing director of JLA. If the managing director issues a certificate of nonperformance, USAID must *370 withhold payment. A second detailed appendix to each of the contracts contains apparently boiler-plate terms required by USAID. The first article of the appendix reserves to USAID certain approval rights with regard to the terms of the contract and certain other items. That article disclaims that USAID is a party to the contract and states that the rights relate to USAID's role in financing the project in question. Although USAID clearly has an interest in the contractual relationship between JLA and petitioner, the terms of the contracts neither give USAID significant control over the physical conduct of petitioner's services nor establish that petitioner is directly performing services in the affairs of USAID. The restatement of agency defines a servant as: "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." 1 Restatement, Agency 2d, sec. 220 (1958). Pursuant to that definition, the terms of the contract do not establish that petitioner is a servant of USAID. Nothing in the record indicates that the contracts were implemented *371 in a way inconsistent with USAID's lack of contractual control. Petitioner communicated with the JLA staff concerning the operational aspects of his contract, not with USAID. He reported at least twice weekly to JLA. He dealt with USAID concerning the receipt of his compensation, but did not either seek or receive any meaningful input from USAID concerning either the scope or performance of his duties. USAID did not treat petitioner as an employee by either paying employee taxes with respect to its disbursements to him or otherwise according him employee status. Indeed, Jan Miller, Assistant General Counsel for Employee and Public Affairs, USAID, testified that, "when [USAID] disburses under a country contract, it is basically disbursing as a trustee because the funds have been granted to the host government. And we hold them in trust for the host government, and we disburse the funds against their commitments and obligations." (Emphasis supplied.) We look to the element of control as a means of ascertaining the identity of petitioner's employer. Our finding that petitioner was not an employee of USAID during the years in issue is based principally on USAID's lack *372 of control over petitioner. We have, however, considered other factors, including implementation of the contracts and USAID's position with regard to its relationship to petitioner. USAID's relationship to petitioner fell far short of master and servant. On the record before us, we find no nexus between petitioner's day-to-day work performance and USAID sufficient to indicate that petitioner was an employee of USAID. Having found that petitioner was not an employee of USAID during the years in question, we hold that petitioners were entitled to the exclusions claimed by them under section 911. Therefore, no deficiencies are due from them for the years in question. Decision will be entered for petitioners.